**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| GREAT POINT PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action  No. 1:10-cv-01019 |
| | ) | |
| JOHN ELLIOTT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | | |
| JOHN ELLIOTT and LAURA ELLIOTT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10-cv-01047 |
| | ) | |
| GREAT POINT PARTNERS, LLC, | ) | |
| The Corporation Trust Company, R/A | ) | |
| Corporation Trust Center | ) | |
| 1209 Orange Street | ) | |
| Wilmington, DE 19801, | ) | |
| | ) | |
| Defendant. | ) | |

**GREAT POINT PARTNERS, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
JOHN ELLIOTT ON THE ISSUE OF LIABILITY FOR BREACH OF CONTRACT**

COMES NOW Great Point Partners, LLC ("Great Point") by counsel, and

pursuant to Rule 56(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), respectfully

submits this Memorandum of Law and the accompanying Declarations of David E. Kroin and

Donald H. Chase, in support of its Motion for Partial Summary Judgment against John Elliott on

1

the issue of liability for breach of contract as alleged in Great Point's complaint in Civil Action No. 1:10-cv-01019 (the "Complaint").

## PRELIMINARY STATEMENT

On July 15, 2010, Great Point and Mr. Elliott entered into a stock purchase agreement (the "Stock Purchase Agreement") pursuant to which Mr. Elliott agreed, among other things, to sell to Great Point all of the shares that he owned in a company known as Mediatech, Inc. ("Mediatech").   Mr. Elliott, a co-founder of Mediatech, and a director and officer of Mediatech at the time, executed the Stock Purchase Agreement of his own volition, and after consultation with counsel, his wife and a personal advisor.

By letter dated August 31, 2010, Mr. Elliott suddenly repudiated the Stock Purchase Agreement and refused to sell his shares to Great Point.  Great Point later learned that despite having executed the Stock Purchase Agreement requiring him, among other things, to sell his shares to Great Point for $4.00 per share, Mr. Elliott had subsequently executed an agreement with Mediatech in which he agreed to sell those same shares to Mediatech at a higher price, in clear violation of his contractual obligations as set forth in the Stock Purchase Agreement.

After his repudiation of the Stock Purchase Agreement, Great Point commenced this action against Mr. Elliott for breach of contract, seeking specific performance and/or damages.  In response to the Complaint, Mr. Elliott answered but pleaded no affirmative defense. At this stage, and as set forth more fully in this Memorandum, there are no genuine issues of material fact to be tried with respect to Mr. Elliott's liability for breach of the Stock Purchase Agreement.  It simply cannot reasonably be disputed that the parties entered into a valid and binding Stock Purchase Agreement, that Mr. Elliott breached that agreement, and that Great

Point suffered damages as a result.   Accordingly, Great Point's motion for partial summary judgment on the issue of Mr. Elliott's liability for breach of the Stock Purchase Agreement should be granted, and this matter should be set down for trial on the remaining damage and remedy issues.


### STATEMENT OF UNDISPUTED FACTS

**A.     The Parties**

1.     Great Point is an investment firm, focusing primarily upon investments in healthcare-related companies.  Kroin Decl. ¶ 2.[1]

2.     John Elliott and Laura Elliott (the "Elliotts") are husband and wife, who collectively own approximately 37% of the common stock of Mediatech.  Kroin Decl. ¶¶ 4-5.

3.     Mediatech is a privately-held company based in Manassas, Virginia, that manufactures and supplies cell-culture and molecular biology reagents to biopharmaceutical, academic and government research facilities.  Kroin Decl. ¶ 3.

4.     Mr. Elliott was one of the founders of Mediatech.  Kroin Decl. ¶ 4; J. Elliott Tr. 14:19 – 15:11; 18:5-8; L. Elliott Tr. 29:4-5[2]; Chase Decl. Exs. E, F.[3]

5.     For many years, Mr. Elliott was the Chief Operating Officer of Mediatech, and one of its largest shareholders, owning 1,035,437.5 shares of Mediatech common stock.  Kroin Decl. ¶ 4; L. Elliott Tr. 10:2-4; 33:12 – 34:22; J. Elliott Tr. 17:21 – 18:20; Chase Decl. Exs. E, F.

---

[1] References to the "Kroin Decl. ¶__" refer to the Declaration of David E. Kroin sworn to on December 2, 2010.

[2] References to "J. Elliott Tr. __" and "L. Elliott Tr. __" refer to the November 19, 2010 deposition transcripts of John Elliott and Laura Elliott attached to the Declaration of Donald H. Chase sworn to on December 2, 2010 (the "Chase Decl.") (as Exhibits C and D, respectively).

[3] References to "Chase Decl. Ex." refer to exhibits attached to the Chase Decl.

6.     For many years, Mr. Elliott was a member of Mediatech's board of directors, a position he held for approximately 14 years.  Kroin Decl. ¶ 4; L. Elliot Tr. 10:2-4; Chase Decl. Exs. E, F.

7.     Laura Elliott was employed by Mediatech as the Customer Support Manager for 14 years, until her retirement in June 2010.  Kroin Decl. ¶ 5; L. Elliott Tr. 11:3–10; Chase Decl. Ex. H.

8.     As a major shareholder, director, and officer during the relevant time period, Mr. Elliott had access to the financial records of Mediatech if he so desired, and as a personal guarantor of Mediatech's credit facility with Branch Banking and Trust Company ("BB&T"), Mr. Elliott also had access to the status of Mediatech's credit line with BB&T if he so desired.  See L. Elliott Tr. 41:15-42:14; Chase Decl. Ex. G.

**B.     Great Point Enters Into a Letter Of Intent with Mediatech**

9.     In April 2010, Great Point entered into a letter of intent (the "LOI") with Mediatech pursuant to which Great Point proposed to acquire a substantial interest in Mediatech (the "Proposed Transaction").  Kroin Decl. ¶ 6, Ex. A, p. 2.

10.     The LOI valued Mediatech at $10.00 per share, subject to Great Point's confirmatory due diligence.  Kroin Decl. ¶ 7, Ex. A, p. 2.

11.     John Elliott and Jim DeOlden, Mediatech's Chief Executive Officer, both signed the LOI on behalf of Mediatech.  Kroin Decl. ¶ 8, Ex. A, p. 8.

12.     As part of the Proposed Transaction, Great Point was to re-negotiate an existing debt facility between Mediatech and its lender BB&T. Kroin Decl. ¶ 9, Ex. A, p. 5.

13.     The LOI expressly acknowledged (and DeOlden and Elliott acknowledged) that there were "existing covenant defaults on the BB&T debt facility."  Kroin Decl. ¶ 10, Ex. A, p. 5.

14.     Mr. Elliot had also personally guaranteed Mediatech's obligations under the BB&T debt facility and his guarantee was outstanding at all relevant times.  Kroin Decl. ¶ 11, Ex. A, p. 5; Chase Decl. Ex. G.

15.     As part of the Proposed Transaction, Great Point agreed to negotiate with BB&T for a release of Mr. Elliott's $5,000,000 personal guarantee of Mediatech's obligations under the BB&T debt facility.  Kroin Decl. ¶ 11, Ex. A, p. 5.

16.     The LOI provides, in pertinent part, that the Proposed Transaction was subject to Great Point's satisfactory completion of "business, financial, legal and accounting due diligence" (the "Due Diligence").  Kroin Decl. ¶ 12, Ex. A, p. 6.

**B.      Great Point Conducts Extensive Due Diligence Regarding Mediatech**

17.     Following the execution of the LOI, Great Point retained accountants, attorneys, consultants and other professionals to conduct the Due Diligence in connection with the Proposed Transaction.  Kroin Decl. ¶ 13.

18.     As part of the Due Diligence process, Great Point's representatives met with various members of Mediatech's management team, including Laura Elliott.  L. Elliott Tr. 38:1 – 39:1.

19.     The Due Diligence revealed to Great Point a number of existing and potential problems at Mediatech such that the value ascribed to Mediatech's stock was substantially overstated.  Among other things, Mediatech's 2009 EBITDA was lower than Mediatech's management had previously represented, Mediatech's manufacturing operations

were not up to the standard represented, and one of Mediatech's major customers had asserted substantial claims against Mediatech for defective products in January 2010, and sued Mediatech for $10 million shortly after the LOI was executed.  Kroin Decl. ¶ 14.

20.     In addition, Mr. DeOlden reneged on his agreement in the LOI to work with Great Point to immediately recruit a Chief Operating Officer for Mediatech.  As a result of the above and other concerns, Great Point concluded that Mediatech's actual value could not justify the proposed investment in Mediatech at the $10 per share price level that had been previously contemplated in the LOI.   Kroin Decl. ¶ 14.

21.     By letter dated June 25, 2010 (the "June 25, 2010 Letter"), Great Point provided Mr. DeOlden and Mr. Elliott with Great Point's "candid assessment" of the results of its Due Diligence.  Kroin Decl. ¶ 15.

22.     The June 25, 2010 Letter indicated, among other things, that Mediatech's EBITDA was "trending down" despite a pick up in sales; that Mediatech was in violation of BB&T loan covenants; and Mediatech was suffering a "liquidity crisis."  Kroin Decl. ¶ 16.

23.     Great Point proposed in the letter to revise the Proposed Transaction by valuing Mediatech at $4.00 per share rather than the $10.00 per share contemplated by the LOI. Kroin Dec. ¶ 16.

24.     Mr. Elliott was "concerned" after receiving the June 25, 2010 Letter and contacted Mr. DeOlden.  L. Elliott Tr.  41:4-7.  Mr. DeOlden represented to the Elliotts that the statements made in the June 25, 2010 Letter "[are] all bogus" and that "none of it is true." L. Elliott Tr. 60:12-15; 61:16-21.  Mr. DeOlden also advised the Elliotts "[Not to] worry about it" and that "Mediatech will address this."  L. Elliott Tr.  60: 12-15; 61:16-21.

25.     Shortly after Great Point sent the June 25, 2010 letter, however, David Kroin of Great Point spoke with John Elliott about the offer set forth in the letter.  L. Elliott Tr. 51:20 – 52:5.  Mr. Elliott wanted to discuss the offer further, and Mr. Kroin offered to fly down to Mr. Elliott's home in Virginia to meet with him and his wife to explain Great Point's perspective on the proposed transaction.  Kroin Decl. ¶ 17.

**C.     The June 30, 2010 Presentation**

26.     On June 30, 2010, Adam B. Dolder and David E. Kroin, both managing directors of Great Point, personally met with the Elliotts at their home in Kilmarnock, Virginia. Kroin Decl. ¶¶ 18-19; L. Elliott Tr.   52:17-22.   Charlie Shermer, a business advisor of the Elliotts, was also present at the request of the Elliotts.  Kroin Decl. ¶ 19; L. Elliott Tr.  54:10 – 55:15.

27.     At this meeting, Mr. Dolder and Mr. Kroin provided a paper copy of a PowerPoint presentation to the Elliotts and Shermer describing Great Point's opinion as to the valuation of Mediatech (the "Presentation").  Kroin Decl. ¶ 20.

28.     Great Point, through Mr. Dolder and Mr. Kroin, explained to Mr. and Mrs. Elliott and Mr. Shermer why Great Point believed Mediatech was appropriately valued at $4.00 per share, and agreed to provide them with a draft stock purchase agreement whereby Great Point would, among other things, purchase their shares at $4.00 per share.  Kroin Decl. ¶ 21.

**D.     Great Point and the Elliotts Negotiate and Enter into a Stock Purchase Agreement**

29.     Mr. Elliott testified that he did not rely on any statements from Great Point or any third party in agreeing to enter into a stock purchase agreement with Great Point. J. Elliott Tr.  41:19-22.

30.     The Elliotts in fact sought the advice of an attorney, and based upon that advice, requested that Great Point make certain changes and additions to the proposed stock purchase agreement.  L. Elliott Tr. 43:22-45:15; 50:1-8.

31.     During the course of the negotiations, Great Point advised the Elliotts to discuss the proposed revisions with their counsel.  Kroin Decl. ¶ 22; L. Elliott Tr.  75:6-13.

32.     The Elliotts also discussed among themselves whether to sign a stock purchase agreement with Mediatech.  L. Elliott Tr.  76:11-20.

33.     On July 15, 2010, the Elliotts executed the Stock Purchase Agreement with Great Point.  Kroin Decl. ¶ 23, Ex. B.

34.     The Stock Purchase Agreement states that it "shall be governed by, and construed in accordance with, the laws of the State of New York."  Kroin Decl. Ex. B, p. 3.

35.     Pursuant to the Stock Purchase Agreement, Mr. Elliott agreed, among other things, to sell the 1,053,437.5 Mediatech shares that he owned (the "Shares") to Great Point at a price of $4.00 per share.  Kroin Decl. ¶ 24, Ex. B, p. 1.

36.     The Stock Purchase Agreement also prohibited Mr. Elliott from engaging in discussion with any other potential purchasers of the Shares, and required Mr. Elliott to take all actions reasonably requested by Great Point.  Kroin Decl. ¶ 24, Ex. B, p. 2.

37.     Before the Stock Purchase Agreement was executed, Great Point explained to the Elliotts that the purchase of the Shares was part of a broader plan for Great Point to acquire and control the voting rights of a majority of all outstanding Mediatech common stock.   Kroin Decl. ¶ 25.

38.     The Elliotts were in fact aware that Great Point was negotiating with another significant shareholder of Mediatech, Baxter Healthcare Corporation ("Baxter"), to

purchase its shares at the same price of $4.00 per share, and thereby obtain voting control of Mediatech, because when combined with Mr. Elliott's shares, Great Point would then control more than 50% of the issued and outstanding shares of Mediatech.  Kroin Decl. ¶ 26; L. Elliott Tr.  80:3-9; 84:15-18.

39.     At Ms. Elliott's request, Great Point provided her with a copy of the signed agreement to purchase the Baxter shares at the same price of $4.00 per share (the "Baxter Agreement").  L. Elliott Tr.  84:5-18.  Kroin Decl. ¶ 27.

40.     After the Baxter Agreement was executed, and in accordance with the Stock Purchase Agreement, Great Point requested that John Elliott send a demand to Mediatech to call a special meeting of shareholders of Mediatech (the "Demand").  Kroin Decl. ¶ 28.

41.     Great Point informed the Elliotts that the purpose of the Demand was to allow Great Point to vote the Elliott and Baxter shares in favor of new Mediatech directors to be nominated by Great Point.  Kroin Decl. ¶ 29.

42.     At all relevant times, Great Point was ready, willing, and able to perform its obligations under the Stock Purchase Agreement, having available funds well in excess of the purchase price of Mr. Elliott's shares.  Kroin Decl. ¶ 35.

**E.     The Elliotts Enter Into a Subsequent Agreement to Sell their Shares to Mediatech**

43.     Mr. Elliott sent the Demand to Mediatech on or about August 17, 2010.  Kroin Decl. ¶ 28-29; L. Elliott Tr. 90:10 – 91:19.

44.     After receiving the Demand, Mr. DeOlden contacted the Elliotts.   L. Elliott Tr. 91:15-21.

45.     Ms. Elliott advised Mr. DeOlden that she and her husband had already signed the Stock Purchase Agreement with Great Point.  L. Elliott Tr. 109:10-12.

46.     Mr. DeOlden stated that the Elliotts' execution of the Stock Purchase Agreement was not a problem and offered instead to have Mediatech purchase Mr. Elliott's Shares.  L. Elliott Tr.  96:10-17; 99:3-6.

47.     Nevertheless, on or about August 24, 2010, Mr. Elliott entered into an agreement with Mediatech that provided, among other things, for the sale of his Mediatech Shares to Mediatech for $10.00 per share based on payments to be made over time.  Kroin Decl. ¶ 30, Ex. C; L. Elliott Tr.  105:16-20.

48.     The Shares that Mr. Elliott agreed to sell to Mediatech are the same Shares that are the subject of his Stock Purchase Agreement with Great Point.  Kroin Decl. ¶ 31.

**F.     The Elliotts Repudiate the Stock Purchase Agreement**

49.     On or about August 31, 2010, Great Point received a letter from counsel for the Elliotts repudiating the Stock Purchase Agreement and demanding its rescission.  Kroin Decl. ¶¶ 32-33; Ex. D.

50.     Mr. Elliott then breached the Stock Purchase Agreement by purporting to withdraw the Demand for a meeting of the shareholders.  Kroin Decl. ¶ 33.

51.     Mr. Elliott also breached the Stock Purchase Agreement by entering into an agreement to sell his Shares to Mediatech.  Kroin Decl. ¶ 34, Ex. C.

52.     Mr. Elliott also breached the Stock Purchase Agreement by refusing to tender his shares to Great Point.  Kroin Decl. ¶ 33.

53.     As a result of Mr. Elliott's failure and refusal to abide by the terms of the Stock Purchase Agreement, Great Point has been significantly damaged because, among other things, Great Point has either lost its opportunity to control and/or acquire Mediatech or such opportunity at the very least has been unreasonably delayed and been made far more costly.

Great Point has also lost all, or at least a portion, of its reasonably-anticipated profit that would have been realized as the result of its ownership and/or control of Mediatech.  Needless to say, Great Point has also expended substantial sums on attorneys and other professionals as a direct result of Elliott's breach.  Kroin Decl. ¶ 36.

I.    **Great Point's Statements to Mr. Elliott Were Not Fraudulent**

54.    All of the statements made in the Presentation to Mr. Elliott on June 30, 2010 were made in good faith based upon Great Point's own analysis of Mediatech and the analysis conducted by the professionals (including KPMG LLP, L.E.K. Consulting LLC, Environ International Corp., and Accureg Regulatory and Compliance Associates) that Great Point hired to review Mediatech's finances and operations as part of the Due Diligence.  Great Point believed that all of the statements in the Presentation were true, and continues to believe that they are true.  Kroin Decl. ¶ 38.

55.    Great Point also assumed that given Mr. Elliott's status and position with Mediatech that he could and would verify for himself any and all of the relevant facts.  Kroin Decl. ¶ 39.

56.    Moreover, the statements that were made in the Presentation about Mediatech were in large part also made in the correspondence to Mr. DeOlden and Mr. Elliott dated June 25, 2010, to which neither Mediatech nor Mr. DeOlden ever responded or disputed prior to this action.  Kroin Decl. ¶ 40.

## PROCEDURAL BACKGROUND

Great Point commenced this action on September 10, 2010 against John Elliott seeking specific performance and/or damages resulting from Mr. Elliott's breach of the Stock Purchase Agreement, plus interest, costs, and reasonable attorney's fees.  Chase Decl. Ex. A.

Mr. Elliott's Answer, while generally denying certain allegations of the Complaint, pleads no affirmative defense to the contract, as required by Fed. R. Civ. P. 8(c). Chase Decl. Ex. B.  This action is consolidated with an action commenced by the Elliotts against Great Point that was removed to this Court from the Circuit Court of London County, Civil Action No. 1:10-CV-01047.  Great Point's motion to dismiss the complaint in that action (the "Elliott Complaint") is currently pending.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact to be tried, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Global Policy Ptnrs., LLC v. Yessin, 686 F. Supp. 2d 642 (E.D. Va. 2010).  While all inferences are to be construed in favor of the non-movant, Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001), a non-movant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). To defeat summary judgment, a non-movant must "designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Rule 56(e)).

The non-movant may not rely on a "mere existence of a scintilla of evidence in support of" his claim, but rather must present evidence on which the jury could reasonably find for him.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327.

## ARGUMENT

## I.

## THE STOCK PURCHASE AGREEMENT IS VALID AND BINDING, AND THERE IS NO GENUINE DISPUTE THAT MR. ELLIOTT BREACHED IT

Great Point's claim for breach of contract is ripe for summary judgment as there are no disputed issues of material fact concerning the execution and enforceability of the Stock Purchase Agreement, or its breach by Mr. Elliott.  The evidence in this case, including the Elliotts' deposition testimony, conclusively demonstrates that Mr. Elliott entered into the Stock Purchase Agreement only after consultation with his lawyer and his wife; that Mr. Elliott had access to ample information about Mediatech that enabled him to make an informed decision as to whether to accept Great Point's offer; and that Mr. Elliott breached the Stock Purchase Agreement with Great Point by accepting a purportedly more lucrative subsequent offer for his shares from Mediatech.  Mr. Elliott's Answer to Great Point's Complaint fails to assert any affirmative defense in accordance with Fed. R. Civ. P. 8(c), and thus raises no defense that could avoid his obligations under the Stock Purchase Agreement.

Under New York law,[4] "the essential elements" of an action for breach of contract are: "(1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff." Nakano v. Jamie Sadock, Inc., No. 98 Civ. 0515, 2000 U.S. Dist. LEXIS 7144, at *5 (S.D.N.Y. May 25, 2000); see also First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir.1998); Rexnord Holdings v.

---

[4] The Stock Purchase Agreement states that it "shall be governed by, and construed in accordance with, the laws of the State of New York."  Kroin Decl., Ex. B, p. 3.  As such, Great Point has cited New York law where appropriate. See Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2001) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances").  In any event, the elements of a breach of contract claim are essentially the same in Virginia.  See, e.g., Albanese v. WCI Cmtys., Inc., 530 F. Supp. 2d 752, 760 (E.D. Va. 20078) ("Under Virginia law, the essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." (internal quotations and citation omitted)).

Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).  The undisputed facts demonstrate each of these elements as a matter of law.

## A.    The Parties Formed A Valid and Enforceable Contract

There is no dispute that the parties executed the Stock Purchase Agreement. Kroin Dec. ¶ 23 Ex. B, p. 3; J. Elliott Tr. 25:10-18; L. Elliott Tr. 76:21 – 77:17.  The agreement itself is clear and unequivocal.  Moreover, Mr. Elliott and his wife consulted with an attorney prior to executing the Stock Purchase Agreement.  L. Elliott Tr. 75:6-13.  The Elliotts also proposed modifications to the terms and conditions of the Stock Purchase Agreement prior to its execution.   Kroin Decl. ¶¶ 22-23; L. Elliott Tr. 72:11 – 75:11.   The Elliotts also clearly understood the intent and purpose of the Agreement.  L. Elliott Tr. 76:21 – 77:17.  Thus, Great Point has satisfied the first element of its breach of contract claim, namely that a valid and enforceable contract exists between the parties.

## B.    Great Point Was Ready, Willing and Able to Perform Its Obligations

With regard to the second element of its breach of contract claim -- that there was performance of the contract by Great Point -- New York law is clear that:

> [a] plaintiff seeking to maintain an action for . . . damages for nonperformance of a contract must demonstrate that a tender of his or her own performance was made, unless tender was waived or the necessity for such a tender was obviated by acts of the other party amounting to an anticipatory breach of the contract or establishing that such party would be unable to perform.

Argonaut P'shp., L.P. v. Grupo Sidek, S.A. de C.V., No. 96 Civ. 1967, 1996 U.S. Dist. LEXIS 15925, at *13-14 (S.D.N.Y. October 25, 1996) (quoting Madison Investments, Inc. v. Cohoes Assoc., 176 A.D.2d 1021, 1021-22, 574 N.Y.S.2d 980, 981-82 (3d Dept. 1991) (citations omitted)); see also Parker v. Moitzfield, 733 F. Supp. 1023, 1025 (E.D. Va. 1990) ("The doctrine of anticipatory breach, or more precisely, of anticipatory repudiation, is well

established in virtually every jurisdiction.  It rests on the sensible notion that an anticipatory repudiation or breach should excuse the non-breaching party from further performance and entitle that party to treat the entire contract as broken and to obtain an appropriate remedy. Were the law otherwise, the result would be inefficiency and unfairness." (internal citation omitted)). Great Point remained at all times ready, willing and able to perform its obligations under the Stock Purchase Agreement.  Kroin Decl. ¶ 35.  Prior to the Elliotts' repudiation, Great Point had already expended substantial resources to reach an agreement to acquire additional Mediatech stock from Baxter at the same price that was agreed upon with the Elliotts, *i.e.*, $4 per share. Kroin Decl. ¶¶ 25-27.  The Elliotts were well aware of this since they requested and received a copy of Baxter's agreement with Great Point.  L. Elliott Tr. 84:11-18; Kroin Decl. ¶ 27.  Great Point had also negotiated with BB&T to release Mr. Elliott from his $5 million personal guarantee upon the consummation of the sale transaction.  Kroin Decl. ¶¶ 35.  Great Point was also ready, willing, and able to consummate the transaction and pay the necessary funds.  Kroin Decl. ¶ 35.  Thus, it is clear that Great Point has established the second element of its breach of contract claim, i.e., that it performed and/or was ready, willing and able to perform.  While Great Point did not deliver the purchase price to Mr. Elliott in exchange for Mr. Elliott's Shares, it was excused from doing so due to Mr. Elliott's prior written repudiation on August 31, 2010, and his refusal to tender his Shares or otherwise abide by his obligations in the Stock Purchase Agreement.  Kroin Decl. ¶¶ 32-33, Ex. D; see De Forest Radio Telephone & Telegraph Co. v. Triangle Radio Supply Co., 243 N.Y. 283, 292-93, 153 N.E. 75 (1926) ("Where one party to a contract repudiates it, and refuses to perform, the other party, by reason of such repudiation, is excused from further performance or the ceremony of a futile tender."); see also Two-Way Tronics, Inc. v. Greater Washington Educational Television Assoc., Inc., 206 Va. 110, 115-116

(1965) ("A refusal to perform or a repudiation of the contract will excuse the other party from making a tender.").

**C.      Elliott Breached the Stock Purchase Agreement**

The Stock Purchase Agreement plainly requires John Elliott to sell 1,053,437.5 shares of Mediatech stock to Great Point at $4.00 per share.  Kroin Decl. ¶¶ 23-24, Ex. B, p. 1. Moreover, the Stock Purchase Agreement requires Mr. Elliott to vote his Shares at the direction of Great Point and, if requested, to demand that Mediatech hold a shareholders' meeting where Mr. Elliott's Shares could be voted.  Kroin Decl. ¶¶ 24-29, Ex. B, p. 2.  Moreover, the Stock Purchase Agreement required Mr. Elliott to deal exclusively with Great Point concerning his Shares.  Kroin Decl. ¶ 24, Ex. B, p. 2.  In breach of these contractual obligations, Mr. Elliott entered into a subsequent agreement with Mediatech in which he agreed, among other things, to sell his Shares to Mediatech.  Kroin Decl. ¶¶ 31, 32, Ex. C.  Not only did this breach Mr. Elliott's obligations to sell his Shares to Great Point, but it also breached his obligation to deal exclusively with Great Point.  Moreover, Mr. Elliott also breached his obligation to vote his Shares as directed by Great Point. Kroin Decl. ¶¶ 24-25.  While Mr. Elliott initially demanded that Mediatech call a shareholder's meeting, he later withdrew that demand in writing.  Kroin Decl. ¶¶ 28-29, 33.

Mr. Elliott's conduct thus constituted an absolute repudiation of the Stock Purchase Agreement as a matter of law.  In order to constitute an anticipatory breach or repudiation, "the announcement of an intention not to perform [must be] positive and unequivocal." Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 150, 408 N.Y.S.2d 36, 38 (1978); see also Vahabzadeh v. Mooney, 241 Va. 47, 51 (1991) ("It is firmly established that for a repudiation of a contract to constitute a breach, the repudiation must be clear, absolute,

unequivocal, and must cover the entire performance of the contract."). Here, the undisputed evidence establishes that Elliott not only refused to tender his Shares to Great Point, but that prior to his repudiation, on August 24, 2010, he entered into a subsequent agreement to sell those same Shares to Mediatech knowing full-well that they "had to get out of the Great Point commitment in order to be able to proceed with [] Mediatech." L. Elliott Tr. 102: 5-7.[5] Toward that end, the Elliotts not only sent a letter to Great Point on August 31, 2010 demanding rescission of the Stock Purchase Agreement but also commenced an action seeking rescission of the Stock Purchase Agreement. Kroin Decl. ¶ 32-33, Ex. D.

**D.      Great Point Has Suffered And Continues To Suffer Substantial Damage As A Result Of Mr. Elliott's Breach**

Finally, there can be no reasonable dispute that Great Point has been damaged by Mr. Elliott's breach. Although not directly at issue in this motion for partial summary judgment as to liability only, Great Point has been damaged by Mr. Elliott's breach because, among other things, Great Point has either lost its opportunity to control and/or acquire a majority interest in Mediatech or such opportunity at the very least has been unreasonably delayed and been made far more costly. Great Point has also lost all, or at least a portion, of its reasonably anticipated profit that would have been realized as the result of its ownership and/or control of Mediatech. Needless to say, Great Point has also expended substantial sums on attorneys and other professionals as a direct result of Elliott's breach.   Kroin Decl. ¶ 36.

---

[5] Laura Elliott testified that the reason for signing the agreement with Mediatech was essentially because it appeared to be more lucrative. L. Elliott Tr. 106: 3-8.

## II.

## MR. ELLIOTT CANNOT AVOID HIS
## CONTRACTUAL LIABILITY BY CLAIMING FRAUD

Mr. Elliott's answer to Great Point's Complaint asserted no affirmative defense pursuant to Fed. R. Civ. P. 8(c), so any defense articulated at this stage should be deemed waived.  Nevertheless, to the extent Mr. Elliott contends that the Stock Purchase Agreement is void because it was procured by fraud, that defense must be rejected as a matter of law.[6]  Initially, and in and of itself dispositive of Mr. Elliott's fraud claim, Mr. Elliott expressly disclaimed reliance on any representations by Great Point during his deposition:

> Question:    We agree that when you signed the [Stock Purchase Agreement], you weren't relying on any advice or statement by anybody else, correct?
>
> Answer:       I would say that is fair.

J. Elliott Tr. 41: 19-22.[7]  Accordingly, since there is no actual reliance on any statement by Great Point, any assertion of fraud is baseless as a matter of law.  Harris v. Dunham, 203 Va. 760, 767 (1962) ("[O]ne who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other."); see also Nurnberg v. Hobo Corp., 30 A.D.3d 359, 360 (1st Dep't 2006) ("A party asserting fraudulent inducement is required to identify . . .  actual reliance resulting in damages.")

Moreover, even if there were evidence of actual reliance, there is in any event no reasonable or justifiable reliance as required for such a claim.  See White v. Potocska, 589 F. Supp. 2d 631, 650 (E.D. Va. 2008) (dismissing fraudulent inducement claim on summary

---

[6] Great Point has filed a motion to dismiss the Elliott Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the basis that it fails to state a claim for which relief may be granted.  Great Point's motion to dismiss is currently pending before the Court and is scheduled for oral argument on December 10, 2010.  Great Point also respectfully incorporates by reference the arguments made in that motion.

[7] Mr. Elliott also stated that he was not even aware of the content of his complaint in this consolidated action.  J. Elliott Tr. 63:6-10.

18

judgment because plaintiff failed to demonstrate that its reliance was "reasonable and justified"); The Elliotts consulted with an attorney subsequent to the Presentation and prior to entering into the Stock Purchase Agreement. L. Elliott Tr. 43:22 – 45:15; 50:1-8.  Based on their attorney's advice, the Elliotts negotiated with Great Point to have several changes made to the proposed agreement. L. Elliott Tr. 50:1-8.  In addition, Mr. Elliott not only co-founded Mediatech, but he was a director and officer of Mediatech from its outset and for many years.  Kroin Decl. ¶¶ 4-5; Chase Decl. Exs. E, F.  Indeed, the Elliotts both testified that at all relevant times he was an officer and director of Mediatech.  L. Elliott Tr. 10:2 – 11:2; J. Elliott Tr. 17:21 – 18:20.  At all relevant times, Mr. Elliott was also a major shareholder of Mediatech and had executed a personal guarantee in connection with Mediatech's credit facility in the amount of $5 million. Kroin Decl. ¶¶ 5, 11; Chase Decl. Ex. G.  Ms. Elliott was also the Customer Service Manager for Mediatech for 14 years until mid-June 2010 and very familiar with its business.  L. Elliott Tr. 11:3-10; Chase Decl. Ex. H.   John Elliott clearly had access to the financial records of Mediatech, and to BB&T's credit line status if he so desired.  L. Elliott Tr. 41:15-42:14.  Despite having unfettered incentive, access, and opportunity to review Mediatech's financial records and BB&T records, the Elliotts admit that they did not conduct any investigation or make any inquiry whatsoever regarding the alleged statements made by Great Point during the Presentation.  L. Elliott Tr. 41:15-42:14.  As Virginia Courts have long held:

> If false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law in general, will leave him where he has been placed by his own imprudent confidence.

White, 589 F. Supp. 2d at 650) (quoting Hitachi, 166 F.3d 614 at 629 (4th Cir. 1998)); see also Dunkin' Donuts of Am., Inc. v. Liberatore, 138 A.D.2d 559, 526 N.Y.S.2d 141, 142 (2d Dep't

1988) ("It has been uniformly held that if the facts represented are not matters peculiarly within the representor's knowledge, and the other party has the means available to him of knowing by the exercise of ordinary intelligence the truth or real quality of the subject of the representation, he must make use of those means or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." (internal citations omitted)).

In addition, Ms. Elliott also testified that she and her husband were "concerned" by the June 25, 2010 Letter from Great Point and that Mr. Elliott contacted Mr. DeOlden, Mediatech's CEO, who advised Mr. Elliott that the contents of the Letter were "bogus" and "not true."  L. Elliott Tr. 60:12-15; 61:16-21.   Nonetheless, the Elliotts took no further action to investigate or inquire as to the truth of Great Point's statements.  L. Elliott Tr. 67:221 – 68:18; J. Elliott Tr. 57:2 – 59:16.  It is well-settled under Virginia law that "[a] party may not be put on notice of a possible problem then sit back, do nothing, and claim reasonable reliance on the seller's allegedly material misstatements."  Ludwick v. Premier Bank North, 935 F. Supp. 801, 808 (W.D. Va. 1996), aff'd, 122 F.3d 1061 (4th Cir. 1987) (granting summary judgment and dismissing fraudulent inducement claim because there was no reasonable reliance by plaintiff because he "was essentially put on notice [of purportedly fraudulent statements] and cannot now claim ignorance based on his own investigatory laziness.").

Finally, Great Point owed no fiduciary duty to make any disclosure to the Elliotts as the Stock Purchase Agreement was an arms-length transaction and the Elliotts admit that they did not know of Great Point prior to its interest in purchasing Mediatech.  L. Elliott Tr. 113:12 – 114:4.   In fact, prior to the June 30, 2010 Presentation, the Elliotts had no relationship whatsoever with Great Point.  L. Elliott Tr. 113:12 – 114:4.  See Western Capital Partners, LLC v. Allegiance Title & Escrow, Inc., 520 F. Supp. 2d 777, 782 (E.D. Va. 2007) (quoting Mueller

v. Thomas, 84 F. App'x 273, 275 (4th Cir. 2003) ("'[a] contract between sophisticated commercial parties transacting at arm's length generally does not create a fiduciary relationship under Virginia Law); see also White, 589 F. Supp. 2d at 650.  Thus, any claim or argument by the Elliotts that they were fraudulently induced to enter into the Stock Purchase Agreement must be rejected as a matter of law.[8]

## CONCLUSION

For all the foregoing reasons, Great Point respectfully requests that the Court grant its Motion for Partial Summary Judgment against Mr. Elliott on the issue of liability for his breach of the Stock Purchase Agreement as well as such other and further relief as the Court deems just and proper.


Dated: Richmond, Virginia
        December 3, 2010

                            Respectfully submitted,

                            GREAT POINT PARTNERS, LLC


                            By:_____/s/_____
                                  Charles Michael Sims (VSB No. 35845)
                                  LeClairRyan, A Professional Corporation
                                  Riverfront Plaza, East Tower
                                  951 East Byrd Street, Suite 800
                                  Richmond, Virginia 23219
                                  Telephone:    804.783.2003
                                  Fax:              804.783.2294
                                  Charles.Sims@leclairryan.com

---

[8]  Since neither fraud in the inducement nor any other affirmative defense has been raised by Mr. Elliott in this action, Great Point need not address such issues further in this motion.  Nonetheless, we note that there are significant other dispositive deficiencies in any assertion of fraud in the inducement by Mr. Elliott, including the lack of any material misrepresentation as a matter of fact and law, the lack of any scienter, and the lack of proximate causation.

Joanna Lee Faust (VSB No. 72930)
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Telephone:     703.647.5915
Fax:              703.647.5986
Joanna.Faust@leclairryan.com
***Counsel for Great Point Partners, LLC***

*Of Counsel*:

MORRISON COHEN LLP
Donald H. Chase
David A. Piedra
909 Third Avenue
New York, New York 10022
Phone: (212) 735-8684
Fax: (212) 735-8708
***Counsel for Great Point Partners, LLC***